CENTRAL FORWARDING, INC. and
Household Goods Carriers' Bureau,
Inc., Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

EASTERN LABOR ADVISORY ASSOCI-
ATION and Southern Tank Line
Carriers, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

DRUG AND TOILET PREPARATION
TRAFFIC CONFERENCE, INC. and the
National Small Shipments Traffic Con-
ference, Inc., Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

Nos. 81–4437, 81–4493 and 82–4019.

United States Court of Appeals,
Fifth Circuit.

Feb. 28, 1983.

Opinion on Denial of Rehearing
May 13, 1983.

John R. Sims, Jr., Dennis Dean Kirk, Washington, D.C., for intervenor Specialized Carriers.

Thomas M. Auchincloss, Jr., Leo C. Franey, Washington, D.C., for petitioners in No. 81–4437 and intervenor Steel Carriers' Tariff Ass'n.

Leonard A. Jaskiewicz, Edward J. Kiley, Washington, D.C., for intervenor Carrier Conference-Irregular Route.

Robert E. Born, Atlanta, Ga., for intervenor National Ass'n of Specialized Carriers, Inc.

Kenneth P. Kolson, John J. Powers, III, Dept. of Justice, Kathleen V. Gunning, I.C.C., Washington, D.C., for respondents.

Keith G. O'Brien, Washington, D.C., for intervenor Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Donelan, Cleary, Wood & Maser, P.C., Frederic L. Wood, Washington, D.C., for intervenor American Frozen Food Institute.

Robert J. Bray, Jr., James J. Wankmiller, John J. McAleese, Jr., Bala Cynwyd, Pa., for amici curiae Southern Tank Line Carriers and Eastern Labor Advisory Ass'n.

John F. Wickes, Jr., Indianapolis, Ind., for amicus curiae Ferree Furniture Exp., Inc.

David E. Driggers, Denver, Colo., for amicus curiae Transystems, Inc., et al.

James D. Porterfield, Pittsburgh, Pa., for amicus curiae Pittsburgh & New England Trucking Co.

Paul D. Angenend, Austin, Tex., for amicus curiae Acme Truck Line, Inc.

Jerry Prestridge, Austin, Tex., for amicus curiae Oil Field Haulers Ass'n, Inc.

Daniel J. Sweeney, Washington, D.C., for petitioners in No. 82–4019.

Before GARZA, REAVLEY and GARWOOD, Circuit Judges.

REAVLEY, Circuit Judge:

These consolidated appeals challenge an Interstate Commerce Commission regulation requiring carriers to reimburse owner-operators for a portion of their fuel costs. Having concluded that the Commission exceeded its statutory authority, we set aside the regulation, suspending the effectiveness of our decision for 60 days following the date of issuance of the mandate, and remand to the Commission in order that the parties may accordingly seek leasing agreements and adjustment of rates. Although our ultimate holding is a narrow one, constrained by particular circumstances, we reach it through a broad inquiry into the rulemaking authority of the Interstate Commerce Commission, and agency rulemaking in general. We write with an awareness of the importance of the case to the parties in this and future disputes.[1]

## I. BACKGROUND

The regulation in question is Ex Parte No. 311 (Sub-No. 4), *Modification of The Motor Carrier Fuel Surcharge Program,* 46 Fed.Reg. 50070, 365 I.C.C. 311 (served October 8, 1981) ("the regulation"). Understanding its purpose and effects requires some knowledge of industry practices and the recent history of regulation in the motor carrier field.

### A. The Parties

The private parties to this suit represent the three principal segments of the regulated motor carrier industry: carriers, owner-operators, and shippers.

Under existing federal law, most forms of interstate for-hire motor transportation require operating authority from the Interstate Commerce Commission ("ICC" or "Commission"). The Commission extends operating authority through licenses known as contract carrier permits or common carrier certificates of public convenience and necessity. Carriers, as that term is used here, are parties possessing such a license. Owner-operators are the "independent truckers" of song and legend. They are persons owning one or a few trucks who lack ICC operating authority. Since they cannot transport regulated commodities in interstate commerce in their own right, they rely on two sources of business: (1) they lease their services and equipment to a carrier in order to utilize the carrier's operating authority, or (2) they make hauls exempt from ICC regulation by transporting agricultural products (49 U.S.C. § 10526), working for a private fleet (49 U.S.C. § 10524), transporting goods intrastate (49 U.S.C. § 10525), etc. Shippers, finally, are the customers of the industry—retailers, manufacturers and others—who have goods to be transported.

---

1. The recently enacted Surface Transportation Assistance Act, Pub.L. 97–424, increases the national tax on gasoline and diesel fuel by five cents a gallon. Since the prices of these fuels are likely to rise as a result, this case may now have an importance beyond that contemplated by the parties when they briefed and argued the case. *See* Wall St.J., Dec. 24, 1982 at 2, col. 1.

In order to haul regulated commodities an owner-operator leases his truck to a carrier, who then hires the owner-operator to drive the truck. These lease arrangements are common, as independent owner-operators account for approximately 40 percent of all intercity truck traffic in this country. H.R.Rep. No. 1812, 95th Cong., 2d Sess. 5 (1978). Typically, in exchange for extending his operating authority and providing a few other services such as advertising, the carrier takes 25 percent of the gross revenue from the haul, leaving 75 percent to the owner-operator, who bears all of the costs of carrying the freight, including fuel, repairs, tolls and the like. *Id.* at 5–6. The lease terms vary, but the 75–25 split is very common in industry practice. The ordinary duration of the lease is from three months to one year. D. Wyckoff & D. Maister, The Owner-Operator: Independent Trucker 85 (1975). While most owner-operators are independent contractors, some are classified as employees under the national labor laws and are represented by unions.

## B. *Genesis of the Regulation*

The current regulation is the latest in a series of actions taken by the ICC related to fuel costs. The dizzying increase in fuel prices associated with the OPEC oil embargo of 1973 had a severe impact on the trucking industry, and was in part responsible for owner-operator shutdowns in 1973–74.

The Commission took a number of actions in response to the new pace of fuel-price inflation. In Ex Parte No. 311, *Expedited Procedures for Recovery of Fuel Costs,* 350 I.C.C. 563 (1975), it established an expedited procedure for regulated carriers to reflect rapidly rising fuel costs in their rates in the event of a future fuel crisis. The Commission entered Special Permission No. 76–350, allowing carriers to increase rates on 10 days' notice instead of the usual 30 days' notice.

In the meantime, congressional hearings were initiated at various locations around the country to learn more about owner-operators and their problems. Some of the hearings are published in *Regulatory Problems of the Independent Owner-Operator in the Nation's Trucking Industry: Hearings Before the Subcomm. on Activities of Regulatory Agencies of the House Comm. on Small Business: Parts I, II, III,* 95th Cong., 2d Sess. (1976–78). The Commission in this case relies on a passage from the House report summarizing the findings of these hearings:

From the monies actually received (75 percent or less of the shipping rate) the owner-operator must pay for his own licensing, operation and gas tax permits which vary widely from state to state. They must also pay for the full cost of regular maintenance plus the monthly payment on his tractor and trailer which runs, on the average, of 12 to 18½ percent interest on a 4-year plan which often is the only credit term available to him. When one recalls that the owner-operator is unable to pass on these expenses to his customer, the gravity of this problem is apparent.

The owner-operator cannot increase his income since it is fixed first by the rate charged for shipping by the carrier and secondly by his 75/25 leasing agreement with the carrier. There is little incentive for the carrier to raise rates because of the competition between licensed carriers. This is especially true, it is remembered, since the carrier gets 25 percent off the top for granting the privilege to work to the independent owner-operator. This added income provides additional income to the carrier. A carrier can lessen the cost squeeze on his rates by giving to a leased operator the same load for 75 percent of the rate and forcing the leasor [sic] to assume all costs.

The owner-operator is caught in a continuing cost crunch. His costs—fuel, lubricants, tires, overnight accommodations, etc.—continue to rise while his income remains inflexible. He is trapped by the regulatory system. If he were able to carry the same load for the full rate, he would be able to compete successfully within the system.

H.R.Rep. No. 1812, 95th Cong., 2d Sess. 6–7 (1978).

The spring of 1979 saw another dramatic rise in fuel prices that cut heavily into owner-operator incomes, resulting in more shutdowns that summer. Since most owner-operators paid their own fuel costs, their expenses were rising rapidly, while their revenue was fixed by previous lease agreements and by rates that could only be changed if carriers sought rate increases. The Commission adopted temporary measures to cope with the problems facing carriers and owner-operators.

On June 1, 1979, Special Permission No. 2620 was issued, allowing carriers to file for fuel-related rate increases in surcharge form on ten days' notice, but requiring the full amount of the surcharge to be passed through to owner-operators that actually paid for the fuel. This measure proved inadequate because many carriers chose not to file for the surcharge or did not file quickly enough to satisfy owner-operators.

On June 15, 1979, the Commission adopted Special Permission No. 79–2800, establishing an average fuel rate increase for the nation, and allowing carriers to file for this average increase in surcharge form on one day's notice. The surcharge was based in part on a national average of the ratio of the owner-operator's fuel expenses to total operating revenue, and became known as the "revenue-based" surcharge. It was in effect until the latest regulation replaced it. One key element of this procedure was that regardless of whether the carrier took the full surcharge, it was required to pass through the maximum allowed surcharge to owner-operators. By its own language Special Permission No. 79–2800 was a response to a situation of "extreme urgency" in which "fuel prices are increasing at an alarming rate." It went on to note that "[b]ecause of the extreme nature of the emergency, the Commission finds that it must order that all regulated carriers, whether or not they have taken an X–311 increase, must from this date forward compensate owner-operators fully for all additional fuel expenses incurred by these operators."

Thereafter, on a weekly basis, the Commission continued to prescribe successively higher fuel surcharges, relating them to a weekly fuel price index using the January 1, 1979 diesel fuel price of 63.5 cents per gallon as a base.

The surcharge program, an emergency scheme enacted in a time of rapidly escalating fuel prices and labor strikes, ultimately created distortions in the rate structure and did not accurately reflect fuel costs. Recognizing that "[t]he surcharge program is intended to be temporary," the Commission initiated Ex Parte No. 311 (Sub-No. 4), *Review of the Motor Carrier Fuel Surcharge Program,* in a notice of proposed rulemaking served on April 11, 1980. The Commission proposed four modifications in the program and requested comments. After reviewing comments and holding hearings, it proposed a fifth modification in a notice served on July 31, 1981.

After receiving several hundred comments and hearing oral argument on the five options, the Commission adopted the current regulation, which replaces the revenue-based surcharge with a plan requiring carriers to compensate owner-operators based on a cents-per-mile formula. The regulation froze the percentage of revenue surcharge and allowed carriers to fold the amount of the surcharge into their rate structure.

Unlike its predecessors, the current regulation cannot be described as an emergency measure. It was adopted some eighteen months after the initial notice of proposed rulemaking, and was not adopted in a time of national labor unrest. Fuel prices were relatively stable as well, for the July 31 notice indicated that "[s]urcharges have been employed only in exigent circumstances such as the fuel crisis which began in the spring of 1979. The circumstances which led to the adoption of the surcharge program no longer exist. Petroleum supplies are ample at present and the price of fuel is now relatively stable."

Furthermore, the regulatory pressures contributing to the plight of the owner-operator had eased since the time they were

recognized by Congress in the hearings that ended in 1978. The Motor Carrier Act of 1980 made it much easier for an owner-operator to become a carrier himself and avoid having to pay carriers for license privileges. Section 5 of the Act substantially lessens the burden on would-be applicants for certificates of public convenience and necessity under 49 U.S.C. § 10922. *See* H.Rep. No. 1069, 96th Cong., 2d Sess. 12–17, *reprinted in* 1980 U.S.Code Cong. & Ad. News 2283, 2294–99. The new standard has been applied very liberally in favor of applicants. "During the first year of implementing the Motor Carrier Act of 1980, some 27,000 opposed motor carrier operating rights cases were decided by the ICC. In not a single case did the Commission conclude that the protestant had satisfied its statutory burden of proving that the proposed operations were inconsistent with the public convenience and necessity." Dempsey, *Congressional Intent and Agency Discretion—Never the Twain Shall Meet: The Motor Carrier Act of 1980,* 58 Chi.Kent L.Rev. 1, 40 (1981).

### C. *The Regulation*

The regulation, served on October 8, 1981, phased out the existing surcharge program and replaced it with a reimbursement plan requiring carriers to reimburse owner-operators on a mileage basis.[2] The rate of reimbursement, initially set at 14 cents per mile, is designed to assure that owner-operators are compensated for all fuel costs above 63.5 cents a gallon incurred while on carrier business.[3] As an option, carriers can avoid the mileage compensation system by providing owner-operators with fuel or credit cards, so that the carrier absorbs all actual costs for fuel above 63.5 cents per gallon. Carriers are provided a means of obtaining a rate increase to offset increased fuel expenses.

Language from the regulation itself best explains its effect. "In establishing current standards for the recovery of fuel increases, the Commission has, in essence, affected one distinct element of the owner-operator's compensation." The Commission has overridden privately negotiated payment arrangements between carriers and owner-operators. "The fuel reimbursement plan delineated in this decision in effect separates owner-operator compensation for fuel costs in excess of 63.5 cents a gallon from the lease agreement." The mileage reimbursement must be paid regardless of the terms of the lease. Furthermore, although the regulation allows changes in the base rate on which the revenue split is made under the lease to prevent double compensation,[4] it forbids changes in leases designed to counteract the effects of the reimbursement plan. "We admonish carriers not to adjust the revenue split in the lease agree-

---

**2.** Clarifications and corrections of the October 8 decision are published at 46 Fed.Reg. 54745–47 (decided October 29, 1981). On November 5, 1981, this court stayed the Commission's decision pending further order. Division 2 of the Commission denied petitions for stay and administrative review on November 6, 1981, and on November 13, the full Commission adopted this decision. On January 18 and 22, 1982, this court denied further motions for stay pending review, and on January 27, 1982, the Commission adopted a revised compliance schedule for Ex Parte 311 (Sub–No. 4), setting the decision's effective date at February 12, 1982. A three-month transition period from the fuel surcharge to the new mileage-based reimbursement program adopted in the regulation was ordered completed by April 13, 1982.

**3.** As explained in the regulation, the 14 cents a mile figure was calculated by dividing the difference in the price of diesel fuel on September 28, 1981 (130.2 cents) and the price on January 1, 1979 (63.5 cents) by a presumed miles-per-gallon figure of 5, then multiplying by a mileage guide "circuitry factor" of 1.06 and rounding off to the nearest half cent.

On March 26, 1982, the Commission issued notice that fuel prices had declined. It ordered initial compensation set at 13 cents a mile effective April 13, 1982, the date coinciding with the termination of the fuel surcharge program. The mileage rate subsequently has been allowed to change in accordance with the method set out in the regulation.

**4.** The parties are allowed to modify their leases to provide that rate increases granted carriers because of increased fuel costs attributable to the fuel reimbursement plan can be retained fully by the carrier, rather than figuring in the "rate base" on which the gross revenue split between the carrier and owner-operator is made.

ment to deprive owner-operators of payments required pursuant to the Commission's compensation method." Because of a perceived lack of bargaining power, the Commission concluded "that owner-operators require a measure of protection in this area and that separate agreements will not accomplish this goal."

The regulation contemplates an ongoing reimbursement plan. For the indefinite future the mandated mileage compensation will be adjusted up or down as fuel prices dictate. The Commission has placed no limits on its power to rethink or recalculate its fuel reimbursement formula in the future, and has thus empowered itself to control compensation in the industry as it wishes.

### D. *Summary of Factual Circumstances*

We decide this case based on the particular circumstances before us. Two key conclusions emerge from the background discussion given above.

First, the stated purpose and actual effect of Ex Parte No. 311 (Sub-No. 4) is to regulate directly compensation paid by carriers to owner-operators. The Commission is not satisfied with leaving compensation in the trucking industry to the private or collective bargaining that reigns throughout most of the American economy, because it believes that owner-operators are victims of inadequate bargaining power and inflexible leases. The fact that the compensation formula is keyed to fuel costs is of little moment, for if this regulation is valid, we fail to see how any other compensation requirement would not also be valid.

Second, this regulation cannot be described as an emergency or stop-gap measure designed to respond to a national or industry-wide crisis. It was adopted after lengthy rulemaking proceedings. There were no fuel or regulatory emergencies facing owner-operators in October of 1981, nor can the agency's action be attributed to the immediate threat of a strike or other labor unrest. The regulation is not a temporary measure, but instead purports to regulate compensation on a permanent basis.

The authority of the Commission and the validity of this regulation must be determined with these factual circumstances in mind.

### E. *Issues on Appeal*

The appeals come to us under 28 U.S.C. §§ 2342(5) (circuit court review of ICC regulation) and 2112(a) (transfer from other circuits). The regulation is the product of informal rulemaking under section 4 of the Administrative Procedure Act, 5 U.S.C. § 553, and is subject to review under section 10 of the Act, 5 U.S.C. § 706(2)(A)–(D):

> The reviewing court shall ... hold unlawful and set aside agency action ... found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law ....

Not surprisingly, the twenty-seven original parties, intervenors and amici curiae have managed to find fault with and defend the regulation under each of these subsections. Those opposing the action taken by the ICC claim, for reasons too numerous to mention here, that the regulation is arbitrary and capricious, that it unconstitutionally impairs existing contracts, that it impermissibly intrudes on the jurisdiction of the National Labor Relations Board in conflict with *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), and that inadequate notice of the agency's action was given. Without reaching these arguments, we find that under subsection (C) the regulation is beyond the statutory authority granted to the Commission by Congress.

## II. COMMISSION AUTHORITY

No one can doubt that Congress could regulate compensation levels in the trucking industry under its sweeping power to

regulate interstate commerce. Nor is there doubt that Congress could delegate that power to the Commission. The question before us is not whether Congress can delegate such authority, but whether it has chosen to do so—a matter of statutory construction by and large.[5] In answering this ultimate question we find it helpful to ask a number of subsidiary questions, all of which shed light on the bounds of an agency's authority: (1) how broadly has Congress granted rulemaking authority to the agency; (2) how closely related to specific delegations of power is the regulation in question; (3) how dramatically does the regulation affect the private parties at which it is aimed?

These three subsidiary questions are not etched in stone, and are not intended to serve as an exhaustive list of factors that courts are obliged to examine in all disputes concerning rulemaking authority. They do, however, offer some clues of congressional intent if fairly answered.

The first two questions are self-evident in their aim. Obviously, if an agency has been granted sweeping powers, and if the regulation at issue clearly falls within the rulemaking prerogatives expressly granted by statute, the court should not hesitate to conclude that Congress has authorized the regulation. On the other hand, if Congress has granted only limited powers to the agency, and the regulation bears little kinship to the rulemaking authority expressed by statute, the validity of the regulation is suspect. These two questions are easier to ask than to answer, and we address them concurrently in the remaining parts of this opinion.

The third question is not so obvious in its aim and we address it here. An inquiry into how dramatically a regulation affects the parties at which it is directed can rarely be answered precisely, and the parties themselves will usually disagree on the regulation's impact. The reviewing court can do little more than give a gestalt reaction to the question. Nevertheless, we are convinced that the more profoundly an agency's actions affect private parties, the more likely it is that Congress would disapprove of the action absent a clear and specific authorization by statute.

By any standard Ex Parte No. 311 (Sub-No. 4), despite its unpretentious name, asserts an awesome power over the motor carrier industry. It cannot be described as a mere procedural or housekeeping rule, nor is it a measure aimed at simply promoting or policing fair dealings among private parties. Instead it removes from the control of these parties their private determination of one aspect of their leasing arrangements, and in effect rewrites each private agreement, to the benefit of one party and the chagrin of the other. The regulation affects tens of thousands of private parties[6] by requiring out-of-pocket reimbursements of hundreds of millions of dollars. By directly regulating private sector compensation, the Commission has taken upon itself a task that Congress does not frequently delegate.[7]

*Western Coal Traffic League v. United States,* 694 F.2d 378, 383–84 (5th Cir.1982).

5. While an agency's interpretation of the statute it is charged with administering is entitled to deference, the courts are the final authorities on issues of statutory construction. *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23, 29–30 (1981). In discussing standards of review in agency appeals, we recently explained that "[w]hile administrative agencies are expert in technical problems within their jurisdiction, they enjoy no special skill in statutory interpretation .... [A] court reviewing an agency's interpretation of its governing statute is not subject to the same constraints that apply when it reviews the procedures the agency adopts to fulfill its mandate."

6. In complying with the Regulatory Flexibility Act, the Commission issued a release under Ex Parte No. 311 (Sub-No. 4). While finding it difficult to estimate how many owner-operators would be affected by the regulation (because some haul exempt commodities and because of the high turnover among owner-operators) the release conservatively estimates the number of owner-operators at 120,000, and estimates the number of carriers subject to the rule at 19,000.

7. While agency-mandated wage controls are not unknown, they can hardly be described as routine. Under current law, Congress sets the

The Government suggests that the Commission's regulations governing fuel cost reimbursements have been promulgated in response to congressional concern about the "cost crunch" that owner-operators have experienced in recent years. As explained above, the current regulation was promulgated several years after this concern was stated, and the regulatory constraints and fuel-price inflation that prompted the concern had subsided.[8] Regardless, we cannot accept any suggestion that the regulation is valid because it is aimed at an evil perceived by Congress, for here the argument cuts both ways. Nothing in the legislative history suggests that Congress thought the Commission had the power to act directly on owner-operator compensation. If it be asked why, then, Congress did not itself attack the problem by specific legislation, the response is that the fact that Congress recognized a problem but chose not to act directly suggests that it would as likely disapprove as approve of the Commission's frontal attack on the problem.

In this instance Congress has expressed considerable concern about the plight of owner-operators, and has not hesitated to enact legislation in their favor.[9] However, Congress has never specifically authorized

---

minimum wage itself. 29 U.S.C. § 206. Even the Davis-Bacon Act, allowing the Secretary of Labor to determine wages to be paid to laborers and mechanics working for contractors doing business with the federal government, requires that the Secretary set the wages equal to those prevailing for corresponding classes of workers in the geographic area in which the work is to be performed. 40 U.S.C. § 276a. Thus, in theory at least, the wage rates are actually set by the private sector.

**8.** *See* part IB of this opinion *supra.* At any rate, the report of the Subcommittee on Special Small Business Problems on which the Government relies, contains not the slightest hint that Congress contemplated for even a moment direct regulation of owner-operator compensation. The report summarizes the findings of the Subcommittee based on several years of hearings, endorses a bill relating to unloading rackets at warehouses (H.R. 14156, 95th Cong., 2d Sess. (1978)), and makes the following recommendations:

> On the basis of the testimony, evidence, and findings the subcommittee recommends:
> A. That the Interstate Commerce Commission:
> 1. Continue the efforts of the Small Business Assistance Office on behalf of small business.
> 2. Maintain a liaison with the chief counsel for advocacy at the Small Business Administration concerning small business issues of interest to both.
> 3. Cooperate with the General Accounting Office on its study of the private fleet issue.
> 4. Continue vigorous enforcement procedures especially in the area of skimming and use its suspension powers if necessary.
> B. That the Secretary of Transportation, the Chairman of the Interstate Commerce Commission, and the Administrator of the Small Business Administration coordinate their efforts and proceed with the joint educational project for owner-operators.

> C. That the General Accounting Office do a study of the private fleet issue focusing on:
> 1. The single source leasing rule of the ICC (49–CFR–1057.6);
> 2. Exceptions to said rule;
> 3. All case law on the subject; and
> 4. Any possible administrative or legislative remedy for the issue which would allow owner-operators to deal with private fleets yet maintain their independent status.
> 5. Meeting with officials of various private fleets, both large and small, to discuss the issue.

> The GAO, in this regard, should work with the appropriate officials at the Interstate Commerce Commission and report back to the subcommittee not later than June 1, 1979.
> D. That the Secretary of Transportation renew efforts to coordinate reform of State motor transportation regulations to insure that interstate traffic moves efficiently and economically and is not impeded unlawfully.
> E. That the Director of the Bureau of Motor Carrier Safety of the Federal Highway Administration study the issue of license plates and determine what State regulatory, Federal regulatory, or insurance problems prevent motor carriers from allowing owner-operators to obtain license plates in their own names. A report on this issue and recommendations for solution of any problems encountered should be delivered to the subcommittee by May 1, 1979.

H.R.Rep. No. 1812, 95th Cong., 2d Sess. 28 (1978).

**9.** The 96th Congress passed laws to protect owner-operators in the Motor Carrier Act of 1980. These provisions are codified at 49 U.S.C. §§ 10527, 11107(b), 11109, 11902a. For an explanation of how these laws are designed to help owner-operators, *see* H.R.Rep. No. 1069, 96th Cong., 2d Sess. 30–33, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2312–15.

the Commission to require fuel reimbursements to owner-operators or to otherwise directly regulate compensation paid to owner-operators. If the Commission has this authority, it does not exist by virtue of congressional hearings and reports alone. If such power exists it is to be found by examining enacted statutes, a task to which we now turn.

The petitioners would have us strike down any regulation of leasing practices between carriers and owner-operators that is not specifically authorized by statute. The respondents would have us uphold any agency action that has a rational basis, that does not contravene any express statutory mandate, and that does not impermissibly interfere with the jurisdiction of another agency. The truth, we think, lies somewhere in between.

### A. *General Rulemaking Authority*

The Commission contends that it had authority to promulgate the regulation under the general rulemaking authority found in 49 U.S.C. § 10321(a), which provides:

> The Interstate Commerce Commission shall carry out this subtitle. Enumeration of a power of the Commission in

this subtitle does not exclude another power the Commission may have in carrying out this subtitle. The Commission may prescribe regulations in carrying out this subtitle.

Removed from its statutory and historical context, this provision is practically devoid of meaning, and offers little help in determining whether the Commission is authorized to regulate compensation paid in motor transportation leasing agreements.

As a preliminary approach to construing the scope of this provision, we note that it is the product of the Revised Interstate Commerce Act of 1978. The purpose of this Act was to rewrite the Interstate Commerce Act in modern prose without effecting any substantive changes in the law.[10] The Act succeeds admirably at simplifying the stodgy language of the previous Interstate Commerce Act, but the previous statutes, perhaps because of their baroque prose, give a better feel for the scope of ICC authority than their terse replacement. We have examined these earlier statutes, reproduced in the margin for the avid reader, and find that they give no mention of ICC authority to regulate owner-operator compensation.[11]

10. The purpose of the [Revised Interstate Commerce Act] bill is to restate in comprehensive form, *without substantive change*, the Interstate Commerce Act and related laws, and to enact those laws as subtitle IV of title 49, United States Code. In the restatement, simple language has been substituted for awkward and obsolete terms, and superseded, executed, and obsolete statutes have been eliminated. This bill is a part of the program of the Office of the Law Revision Counsel of the House of Representatives to prepare and submit to this Committee, for enactment into positive law, all titles of the United States Code.
H.R.Rep. No. 1395, 95th Cong., 2d Sess. 4–5, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3009, 3013 (emphasis added).

11. Historical notes following each section of the Revised Interstate Commerce Act indicate the statutory source provisions for each new section. The sources of the current section 10321(a) are 49 U.S.C. §§ 12(1)(a) (1st sentence, 2d sentence less words after the semicolon, and last sentence words before 1st semicolon), 15(16), 20b(10), 304(a) (matter before (1), (6), and (7) (less words after last semicolon)),

904(a) and (b) (less words after last semicolon), 1003(a) and (e) (less words after last semicolon) (all repealed 1978). Section 12(1)(a) provided, in pertinent part:

> The Commission shall have authority, in order to perform the duties and carry out the objects for which it was created, to inquire into and report on the management of the business of all common carriers subject to the provisions of this chapter [regulating railroad and pipeline carriers], and to inquire into and report on the management of the business of persons controlling, controlled by, or under a common control with, such carriers, to the extent that the business of such persons is related to the management of the business of one or more such carriers, and the Commission shall keep itself informed as to the manner and method in which the same are conducted. The Commission may obtain from such carriers and persons such information as the Commission deems necessary to carry out the provisions of this chapter .... The Commission is authorized and required to execute and enforce the provisions of this chapter ....
Section 15(16) provided:

Our inquiry does not end simply by noting that the general rulemaking provision does not single out owner-operator leasing and compensation arrangements as subjects for ICC regulation. In the leading case of *American Trucking Associations v. United States,* 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953) (*"ATA"*), the Supreme Court held that the ICC could regulate certain leasing practices between carriers and owner-operators despite the lack of any express delegation of power under the Interstate Commerce Act ("Act"). The respondents rely on language from the case where the Court found that "[o]ur function, however, does not stop with a section-by-section search for the phrase 'regulation of leasing practices' among the literal words of the statutory provisions." 344 U.S. at 309, 73 S.Ct. at 314, 97 L.Ed. at 355. Despite this language, we do not read the case as granting carte blanche to the Commission over leasing practices.

The Commission rules reviewed in *ATA* required that contracts between owner-operators and carriers be reduced to writing, vest control of the equipment in the carrier,

> The foregoing enumeration of powers [relating to railroad and pipeline rate regulation] shall not exclude any power which the Commission would otherwise have in the making of an order under the provisions of this chapter [regulating railroad and pipeline carriers]. Section 20b(10) provided:
> The Commission shall have the power to make such rules and regulations appropriate to its administration of the provisions of this section [relating to modification of railroad financial structures] as it shall deem necessary or desirable.
> Section 304(a) provided, in pertinent part:
> It shall be the duty of the Commission . . . .
> (6) To administer, execute, and enforce all provisions of this chapter [regulating motor carriers], to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration; and
> (7) For purposes of the administration of the provisions of this chapter, to inquire into the management of the business of motor carriers and brokers, and into the management of the business of persons controlling, controlled by, or under common control with, motor carriers to the extent that the business of such persons is related to the management of the business of one or more motor carriers, and the Commission shall keep itself informed as to the manner and method in which the same are conducted, and may obtain from such carriers and persons such information as the Commission deems necessary to carry out the provisions of this chapter. . . .
> Section 304(a) is the only source provision dealing with motor carriers, and is discussed in greater detail in part IIB of this opinion *infra.* Section 904(a) and (b) provided, in pertinent part:
> (a) It shall be the duty of the Commission to administer the provisions of this chapter [regulating water carriers], and to that end the Commission shall have authority to make and amend such general or special rules and regulations and to issue such orders as may be necessary to carry out such provisions.
> (b) The Commission shall have authority, for purposes of the administration of the provisions of this chapter, to inquire into and report on the management of the business of water carriers, and to inquire into and report on the management of the business of persons controlling, controlled by, or under a common control with water carriers, to the extent that the business of such persons is related to the management of the business of one or more such carriers, and the Commission shall keep itself informed as to the manner and method in which the same are conducted. The Commission may obtain from such carriers and persons such information as the Commission deems necessary to carry out the provisions of this chapter . . . .
> Section 1003(a) and (e) provided, in pertinent part:
> (a) It shall be the duty of the Commission to administer the provisions of this chapter [regulating freight forwarders], and to that end it shall have the authority to make and amend such rules and regulations and to issue such orders as may be necessary to carry out its provisions.
> (e) The Commission shall have authority, for purposes of the administration of the provisions of this chapter, to inquire into and report on the management of the business of freight forwarders, and to inquire into and report on the management of the business of persons controlling, controlled by, or under a common control with freight forwarders, to the extent that the business of such persons is related to the management of the business of one or more such freight forwarders, and the Commission shall keep itself informed as to the manner and method in which the same are conducted. The Commission may obtain from such freight forwarders and persons such information as the Commission deems necessary to carry out the provisions of this chapter . . . .

exceed thirty days in length, and fix the compensation of the owner-operator by a manner other than a percentage of the gross revenue. The rules also required inspection of the non-owned equipment by the carrier, testing of the driver's familiarity with Motor Carrier Safety Regulations, and records on the use of equipment. The effect of the rules was to abolish a practice known as "trip leasing."

The rules were justified as necessary to preserve the express statutory mandates of the Act. Trip leasing was found to encourage violation of statutory safety requirements and limitations on certified authority, and the statutory mandate to provide nondiscriminatory service. The Court also found that the use of leased equipment tended to obstruct normal rate regulation. It found that numerous statutory provisions of the Act [12] were in jeopardy, including sections 216(b) and 218(a) (rate regulation), 204(a)(2) (safety requirements), 204(a)(1) (continuous service), 208(a) and 209(b) (observance of authorized routes and termini), and 216(d), 217(b), 218(a) and 222(c) (prohibition of rebates), and concluded that "practically the entire regulatory scheme is affected by trip leasing." [13]  344 U.S. at 310–12, 73 S.Ct. at 315, 97 L.Ed. at 355–57.

Under such circumstances, the Commission was held to have the authority to enforce the provisions of the Act under its general rulemaking authority found in section 204(a)(6). [14] However, we read *ATA* as interpreting the general rulemaking provision to be a limited grant of authority to the Commission to carry out and enforce the express mandates of the Act. The Court did not find the provision to be a grant of power to regulate all aspects of the motor carrier industry, but instead found that "as exercised, the power under § 204(a)(6) is geared to and bounded by the limits of the regulatory system of the Act which it supplements." 344 U.S. at 313, 73 S.Ct. at 316, 97 L.Ed. at 357.

Other Supreme Court precedents are consistent with this view. In *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), the Court upheld the authority of the Federal Reserve Board to promulgate the "Four Installment Rule" found in Regulation Z. Such authority was found to exist under the general rulemaking provision of the Truth in Lending Act, 15 U.S.C. § 1604(a) which provides:

> The Board shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain ... provisions ... as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

In broad language the Court states:

> Where the empowering provision of a statute states simply that the agency may "make ... such rules and regulations as may be necessary to carry out the provisions of this Act," we have held that the validity of a regulation promulgated

---

**12.** These provisions were added to the Interstate Commerce Act by the Motor Carrier Act of 1935, which extended ICC regulatory authority to the motor carrier industry. Before being rewritten without substantive change by the Revised Interstate Commerce Act of 1978, the motor carrier provisions were codified at 49 U.S.C. §§ 301–327.

**13.** The Commission had made similar findings in promulgating the rules.

> The Commission found, among other things, that in many instances when authorized carriers trip-lease vehicles owned by others the safety requirements imposed under part II of the act are not observed; that the practice of trip leasing makes it difficult to fix carrier responsibility; and that some of the arrangements made between authorized carriers and the owners of trip-leased vehicles tend to hamper normal rate regulation and otherwise have an adverse effect on the economics and stability of the motor carrier industry.

H.R.Rep. No. 2425, 84th Cong., 2d Sess., *reprinted in* 1956 U.S.Code Cong. & Ad.News 4304, 4307.

**14.** Section 204(a)(6) of the Act, 49 U.S.C. § 304(a)(6) (repealed 1978), conferred a duty on the Commission "[t]o administer, execute, and enforce all provisions of this part [regulating motor carriers], to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration."

thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation."

411 U.S. at 369, 93 S.Ct. at 1660–61, 36 L.Ed.2d at 329–30. The opinion is clear, however, in recognizing that the regulation was aimed at carrying out specific statutory mandates requiring merchants to indicate the amount and rate of finance charges, 15 U.S.C. § 1638, and aimed at avoiding the uninformed use of credit by consumers, 15 U.S.C. § 1601. As in *ATA,* the Court found the regulation to be designed to enforce these express mandates:

Congress was clearly aware that merchants could evade the reporting requirements of the Act by concealing credit charges. In delegating rulemaking authority to the Board, Congress emphasized the Board's authority to prevent such evasion. To hold that Congress did not intend the Board to take action against this type of manipulation would require us to believe that, despite this emphasis, Congress intended the obligations established by the Act to be open to evasion by subterfuges of which it was fully aware.

411 U.S. at 371, 93 S.Ct. at 1661, 36 L.Ed.2d at 330.

Similarly, the Court in *Gemsco, Inc. v. Walling,* 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945) found that the Administrator of the Wage and Hour Division of the Department of Labor was empowered under the Fair Labor Standards Act of 1938 to prohibit companies from allowing or requiring their employees to do industrial homework. Speaking of the *Gemsco* case, the *Mourning* Court said:

The Act required the Administrator to approve orders which were designed to raise the minimum wage to 40 cents an hour. While the Act did not specifically mention industrial homework, § 8(f) stated that the Administrator's orders

"shall contain such terms and conditions as the Administrator finds necessary to carry out the purposes of such orders, to prevent the circumvention or evasion thereof, and to safeguard the minimum wage rates established therein."

[52 Stat. 1065 (1938)]. After hearings, the Administrator determined that homework furnished "a ready means" of evading his orders, and prohibited certain companies subject thereto from employing this means of production. The Court concluded that the Administrator had not exceeded his authority under the Act, noting that a more restrictive interpretation of the enabling provision would have rendered the Act inoperable.

411 U.S. at 370, 93 S.Ct. at 1661, 36 L.Ed.2d at 330.

None of these cases suggests that general rulemaking authority empowers an agency—established to enforce and carry out a congressional act—to promulgate regulations which run far afield from the specific substantive provisions of the act.[15] Our reading of *ATA* and related cases is that a general rulemaking provision should be read as a kind of necessary and proper clause. It grants considerable powers to enforce the substantive mandates of federal law governing interstate motor transportation, but is tied to and limited by those specific substantive provisions. It does not open whole new horizons on the regulatory landscape. Congress has not delegated wholesale control of all affairs of motor carriers to the Commission, and it would

---

**15.** In *Global Van Lines, Inc. v. ICC,* 627 F.2d 546 (D.C.Cir.1980), *cert. denied,* 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981), the District of Columbia Circuit relied on *ATA* and *Mourning* in holding that the ICC had authority under its general rulemaking powers to promulgate a regulation requiring carriers to return escrow deposits to owner-operators within 45 days and pay interest on the deposits at a rate equal to the 91-day Treasury bill rate. We express no view as to the correctness of that decision, but note that it may well be distinguishable. That case dealt with a regulation promulgated before the Motor Carrier Act of 1980, an act which has changed (or at least made clear) the scope of ICC authority, as explained below. Furthermore, using the mode of analysis that we advocate in this opinion, the regulation in *Global* has a much less dramatic impact on private parties than the regulation here.

require more than the language of 49 U.S.C. § 10321(a) to warrant a construction of the Act to that effect.

Statutory pronouncements subsequent to *ATA* strongly enforce a state of the law in accord with our reading of *ATA.* The Motor Carrier Act of 1980 enacts numerous and important changes in the law regulating interstate motor transportation, and represents a shift in attitude on the role of government, and particularly the ICC, in regulating that industry. Section 2 of the Act, 49 U.S.C. § 10101 note, 94 Stat. 793 (1980) gives its purpose: "This Act is part of the continuing effort by Congress to reduce unnecessary regulation by the Federal Government." Section 3(a) of the Act, *id.,* gives the congressional findings prompting the legislation:

> The Congress hereby finds that a safe, sound, competitive, and fuel efficient motor carrier system is vital to the maintenance of a strong national economy and a strong national defense; that the statutes governing Federal regulation of the motor carrier industry are outdated and must be revised to reflect the transportation needs and realities of the 1980's; that historically the existing regulatory structure has tended in certain circumstances to inhibit market entry, carrier growth, maximum utilization of equipment and energy resources, and opportunities for minorities and others to enter the trucking industry; that protective regulation has resulted in some operating inefficiencies and some anticompetitive pricing; that in order to reduce the uncertainty felt by the Nation's transportation industry, *the Interstate Commerce Commission should be given explicit direction for regulation of the motor carrier industry and well-defined parameters within which it may act pursuant to congressional policy; that the Interstate Commerce Commission should not attempt to go beyond the powers vested in it by the Interstate Commerce Act and other legislation enacted by Congress;* and that legislative and resulting changes should be implemented with the least amount of disruption to the transporta-

tion system consistent with the scope of the reforms enacted.

(Emphasis added).

The legislative history of the 1980 Act explains the section thus:

> Section 3 stresses the importance to the national economy and national defense of a safe, sound, competitive, and fuel-efficient motor carrier system. It also states that, in order to achieve such a system, Congress finds it necessary to revise the statutes governing Federal regulation of the motor carrier industry. The existing regulatory structure has tended in certain circumstances to inhibit innovation and growth and has failed, in some cases, to sufficiently encourage operating efficiencies and competition.
>
> *In revising the statute, Congress also intends to give the Interstate Commerce Commission explicit direction for the regulation of the motor carrier industry and to ease that industry's uncertainty about the future of regulation by the Commission. The Commission is admonished to stay within the powers specifically vested in it by the revised law.*
>
> In addition, this section states that Congress intends that the changes in the statutes and any resulting changes be implemented with the least amount of disruption to the transportation system as possible. ·

H.R.Rep. No. 1069, 96th Cong., 2d Sess. 10–11, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2292–93 (emphasis added).

*ATA* is undeniably still good law. *ICC v. Brannon Systems, Inc.,* 686 F.2d 295, 296 (5th Cir.1982). It must, of course, be read in light of subsequent statutory developments.

■ We conclude that the general rulemaking provision imparts power to the ICC only to enforce and carry out the specific substantive mandates enacted by Congress. Our task therefore turns to deciding whether the regulation falls within the ambit of any statutory mandate governing leasing arrangements or compensation that the Commission is authorized to enforce.

## B. *Regulation of Compensation*

The current statutory scheme regulating interstate transportation is hard to sum up in a few sentences, for it represents nearly a century of legislation that has at different times favored railroads, motor carriers, owner-operators and the public.

Unquestionably Congress has granted enormous powers to the Commission to regulate the interstate transportation industry. Most notably, the Commission has been granted authority to regulate prices and market entry, matters normally left to market forces and subject at most to policing under the antitrust laws. Power over pricing exists by virtue of the Commission's authority to regulate rates charged by carriers. *See generally* 49 U.S.C. §§ 10701–10786. Power over entry exists under the Commission's authority to grant certificates of public convenience and necessity and other licenses. *See generally* 49 U.S.C. §§ 10901–10934. There are, however, no general provisions authorizing the ICC to regulate labor compensation levels, another extremely important economic function.

The Commission maintains that it has authority to regulate compensation under its authority to promote continuous and adequate transportation found in 49 U.S.C. § 11101(b), which provides:

> The Commission may prescribe requirements for continuous and adequate transportation and service provided by motor common carriers and freight forwarders subject to the jurisdiction of the Commission under subchapters II and IV of chapter 105 of this title and for transportation of baggage and express by such motor common carriers of passengers.

We think that this provision should not be read to authorize ICC regulation of labor compensation.

We note at the outset that this provision was enacted by the Revised Interstate Commerce Act of 1978. As explained above, this act rewrote the Interstate Commerce Act without substantive change. The statutory source of section 11101(b) is section 204(a)(1) of the Motor Carrier Act of 1935 (part II of the Interstate Commerce Act), 49 U.S.C. § 304(a)(1) (repealed 1978),[16] which provided that it shall be a duty of the Commission:

> To regulate common carriers by motor vehicle as provided in this chapter, and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.

This section was repealed by the Revised Interstate Commerce Act of 1978, except for the clause "qualifications and maximum hours of service of employees, and safety of operation and equipment," which is scheduled for future codification in subtitle II of title 49. H.R.Rep. No. 1395, 95th Cong., 2d Sess. 220, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3009, 3229.

▪ The specific language at the end of section 204(a)(1), limiting regulation of employees to setting "qualifications and maximum hours of service" cannot be ignored. Specific words that follow a general term restrict the application of the general term to things that are similar to those enumerated. *General Electric Co. v. Occupational Safety and Health Review Commission,* 583 F.2d 61, 65 (2d Cir.1978). This rule of construction suggests that the Commission's power to promote continuous and adequate service does not extend to setting labor compensation levels, but is restricted to setting qualifications for employment and maximum hours.

The courts have consistently read section 204 as a statute authorizing the ICC to set maximum hours of truckers in the interest of safety. *Southland Gasoline Co. v. Bayley,* 319 U.S. 44, 48, 63 S.Ct. 917, 919, 87 L.Ed. 1244, 1249 (1943); *Starrett v. Bruce,* 391 F.2d 320, 323 (10th Cir.), *cert. denied,*

---

**16.** Section 11101(b) is also derived from 49 U.S.C. § 1003(b) (repealed 1978), dealing with regulation of freight forwarders and not applicable here.

393 U.S. 971, 89 S.Ct. 404, 21 L.Ed.2d 384 (1968) ("Section 204 of the Motor Carrier Act is limited in its effect to those employees whose activities affect the safety of operation of motor vehicles engaged in interstate commerce."); *Commercial Standard Insurance Co. v. Robertson,* 159 F.2d 405, 409–10 (6th Cir.1947). They have not read it to confer power to the Commission to regulate compensation.

The legislative history of the 1935 Act gives a clear impression that section 204 was aimed at promoting safety, and authorized regulation of working hours to that end. *See* 79 Cong.Rec. 5650–52 (1935). At one point, the floor debate centered on the scope of section 204, and Senator Burton Wheeler, the sponsor of the bill, insisted that it was intended to regulate hours but not wages:

> MR. WHEELER. But on page 10, *in section 204, the Commission is given the power to establish reasonable requirements with respect to the qualifications and maximum hours of service of employees, and the safety of operation and equipment.*
>
> MR. COUZENS. But I point out what I said before, when I think perhaps the Senator was out of the Chamber for a moment, that further on in the bill there is a provision for removing these activities from the code authorities [of the National Industrial Recovery Act], and, in effect, this will make employees of an industry of this kind worse off than any other class of employees, because they now have a minimum wage under the codes, *and there is no minimum wage provided in the bill.*
>
> MR. WHEELER. Mr. President, I do not agree with the Senator. As I read the bill, insofar as the code authorities conflict with the provisions of the bill, then the provisions of the bill shall prevail; but the bill certainly would not now repeal the hours of service provided in the code authority.
>
> MR. COUZENS. I am not talking about the hours of service.

> MR. WHEELER. *It has nothing to do with the wages.* As a matter of fact, when we pass a railway labor bill, or a bill regulating interstate commerce, *we do not and we cannot fix by law, it seems to me, the rates of wages to be paid to employees.* We cannot do it with reference to railroad labor, *we cannot do it with reference to truck and bus labor,* we cannot do it with reference to any other class of labor. All we can do is to say to them that they can fix the maximum hours. We could specify that it was thought to be wise to do that instead of giving the Commission the power to fix the maximum hours, to specify that the limit of hours should be 12, or 10, or 16, or whatever we wanted to make it. But that is as far as we could go, it seems to me, in legislation of this kind. *We cannot fix the rate of wages in a bill such as this.*
>
> *That is the matter which must be handled by contractual arrangement between the truck operators and their employees.* We have given the power to the Commission to regulate the hours of service.

79 Cong.Rec. 5660–61 (1935).

It must be remembered that the 1935 Act was passed during the substantive due process era, when the Supreme Court was striking down New Deal legislation, and Congress had doubts about its powers to enact economic legislation. It was not until two years later that the Supreme Court upheld state minimum wage legislation. *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937) (overruling *Adkins v. Children's Hospital,* 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923)). The following year Congress enacted federal minimum wage legislation in the Fair Labor Standards Act of 1938. The congressional history of that act corroborates our conclusion that the Motor Carrier Act of 1935 did not authorize ICC regulation of labor compensation.[17]

---

**17.** During the Senate floor debates in 1937, an amendment was introduced to exempt employees of motor carriers from the regulation of hours by the Fair Labor Standards Act. The

■ Furthermore, there is evidence that not only was the 1935 Act not intended to regulate compensation, but that it did not cover independent owner-operators at all, even as to hours. A letter from Mr. Eastman, Coordinator of the ICC at the time, stated:

It should be noted, also, that the proposed amendment [regulating maximum hours] applies only to "employees" and would not reach the owner-drivers. Yet the latter probably operate the larger number of the trucks in service and it is with respect to owner-drivers that the worst and most numerous instances of long hours have been reported. From the standpoint of public safety, therefore, the amendment fails to attack the worst feature of the present situation.

79 Cong.Rec. 12229 (1935). As passed, section 204 applied only to employees, and therefore would not in Mr. Eastman's view cover most owner-operators, who are independent contractors rather than employees.

It was not until some two decades later that legislation was passed directly regulating owner-operator leasing arrangements, as explained in the next section of this opinion. The 1935 Act had the endorsement of the ICC and was in fact introduced by Senator Wheeler at its request, and more particularly at the request of Mr. Eastman. 79 Cong.Rec. 5650 (1935). An agency's contemporaneous interpretation of its own statute is entitled to great weight, especially when the agency played a role in setting the statutory machinery in motion. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22, 31 (1980); *Mid-Louisiana Gas Co. v. FERC,* 664 F.2d 530, 534 (5th Cir.1981).

■ The wording of the statute, the case law and the legislative history all point to the conclusion that section 204(a)(1) of the Motor Carrier Act of 1935, recodified at 49 U.S.C. § 11101(b), does not grant the ICC authority to regulate compensation paid by carriers to owner-operators.

colloquy makes clear that the ICC was given authority to regulate hours but not wage compensation:

MR. SHIPSTEAD. Am I to understand the Senator from Alabama to say that the Interstate Commerce Commission is now undertaking to regulate hours and wages of truck drivers?

MR. [HUGO] BLACK. Not wages, but hours of labor.

MR. SHIPSTEAD. I have reliable information that at least up to 10 days ago truck drivers in my State were being paid $9.60 a week for a 48-hour week. Is there any provision in the bill that can reach such a situation? Under the ruling of the Interstate Commerce Commission or under the provisions of the bill now before the Senate, can the situation be controlled?

\* \* \* \* \* \*

MR. MOORE. Mr. President, I do not by my amendment seek to fix wages. It relates merely to hours of labor. Under the Interstate Commerce Act the Interstate Commerce Commission is given authority to prescribe maximum hours and qualifications for service. My amendment seeks only to leave the fixing of hours, but not the fixing of wages, with the Interstate Commerce Commission. The bill would take care of the wage question.

\* \* \* \* \* \*

MR. BLACK. Mr. President, as the bill is now written, employees of trucking compa-

nies are included in both the minimum-wage and maximum-hour provisions. The amendment of the Senator from New Jersey [MR. MOORE] would exempt them only from the maximum-hour provision. The question of minimum wages would still be governed by the provisions of the bill. The reason why the Senator from New Jersey is offering the amendment is that the law now imposes upon the Interstate Commerce Commission the responsibility and duty of regulating hours.

As I said, speaking for myself alone, I am of the opinion that it would be very unwise indeed to seek to entrust the same responsibility to two governmental agencies.

MR. SHIPSTEAD. I agree with that.

MR. BLACK. I further believe, inasmuch as the Interstate Commerce Commission regulates truck and railroad employees, and insofar as the law relates to certain aviation employees, the regulation of the hours of such employees should remain with the Interstate Commerce Commission under those laws. Therefore, I do not object to the amendment which has been offered by the Senator from New Jersey.

81 Cong.Rec. 7875 (1937). The amendment is codified at 29 U.S.C. § 213(b)(1). Senator Black, an ardent supporter of the New Deal, was nominated to the Supreme Court the same year.

## C. Regulation of Leasing Practices

In 1956 Congress amended the Interstate Commerce Act with a statute concerning carrier leasing practices. The law granted authority to the ICC to require certain conditions in leasing arrangements, including requirements that carriers put the lease in writing, carry the writing in each leased vehicle, inspect the vehicle and carry insurance on it. 49 U.S.C. § 11107(a). The amendment exempted from leasing regulation vehicles exempt under other provisions of the Act, principally those hauling agricultural commodities. 49 U.S.C. § 11101(c). In 1980, Congress directed the Commission to require that all arrangements between carriers and owner-operators specify who is responsible for the loading and unloading of the truck. 49 U.S.C. § 11107(b).

The petitioners argue that the ICC can do no more than regulate lease arrangements as specified in section 11107. The respondents argue that in prohibiting regulation of "the amount of compensation payable" under leases involving exempt commodities in section 11101(c), Congress has implicitly authorized regulation of compensation paid by regulated carriers. We cannot accept either position.

Section 11107 does not operate as the exclusive source of ICC authority to regulate leasing practices. *Global Van Lines, Inc. v. ICC,* 627 F.2d 546, 550–51 (D.C.Cir. 1980), *cert. denied,* 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981). Such a reading of the statute would be inconsistent with *ATA,* which held that authority to regulate leasing practices exists under the general rulemaking provision as well. The 1956 amendment was written with the *ATA* case in mind. H.R.Rep. No. 2425, 84th Cong., 2d Sess., *reprinted in* 1956 U.S.Code Cong. & Ad.News 4304, 4306, 4313 ("*House Report*"). There was no attempt to undermine the *ATA* decision, and indeed the statute codifies some of the rules upheld in the case, because "[w]hile it is true that the courts have held that some of this authority already rests with the Commission, still it is believed advisable to make them law by enactment rather than by court decision."

S.Rep. No. 1271, 84th Cong., 1st Sess. 6 (1955) ("*Senate Report*").

The 1980 amendment adding section 11107(b) was aimed at certain extortionate "lumping" practices and is one of a number of statutory provisions designed to prevent those practices. *See* 49 U.S.C. §§ 11109, 11702(a)(2), 11902a; H.R.Rep. No. 1069, 96th Cong., 2d Sess. 30–31, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2312–13. We read section 11107(b) as one small part of a statutory scheme aimed at a very specific problem, and find it inconceivable that this narrow provision excludes other regulation of leasing practices.

However, we find it equally inconceivable that section 11101(c) impliedly grants the ICC authority to set compensation levels for regulated carriers by prohibiting regulation of otherwise exempt haulers of agricultural commodities. The intended purpose of the provision was to appease agricultural interests by preserving or adding exemptions from ICC regulation. *Agricultural Transportation Association of Texas v. King,* 349 F.2d 873, 881 (5th Cir.1965); *House Report* at 4305, 4307–10; *Senate Report* at 2–3. There was concern that a proposed regulation by the Commission was "too drastic," and partly in response to this concern, the effect of the statute was to restrict ICC authority. *Senate Report* at 5. Certainly the exemptions from regulation set out in section 11101(c) were never intended to serve as a source of rulemaking authority by negative implication.

Finally, the respondents direct us to the following excerpt in the legislative history of the 1956 amendment:

OBJECTIONS TO S. 898

The primary objection made to the bill in its original form was that it would take from the Interstate Commerce Commission the power to regulate trip leasing by denying the right to regulate the duration of the lease, or *the amount of compensation* to be paid under its terms. Such an amendment, it is said, would severely handicap the Commission in its attempt to control the so-called gypsy operator, the real evil in trip leasing.

## CONCLUSION

The committee believes that the solution to the problem is to enact into law that part of the Interstate Commerce Commission's regulation, as modified in the amended bill, which deals with trip leasing by exempt carriers. By so doing the Congress will allay the fears of exempt carriers, protect their legitimate operations while at the same time leave the Commission free to regulate the carriage of goods on the public highways, a duty imposed upon it by law.

*Senate Report* at 5 (emphasis added). The Government places importance on this passage. We do not. The fact that some unnamed protestors, who may or may not have been members of Congress, thought that an earlier version of the amendment would strip the Commission of power to regulate compensation does not mean that such power ever existed.

In sum, the legislation specifically dealing with leasing practices neither grants nor denies the Commission power to regulate compensation paid under lease arrangements. Such power, if it exists, must be found elsewhere.

### D. *The National Transportation Policy*

In addition to its general rulemaking authority and section 11101(b) and (c), the Commission bases its authority to promulgate the regulation on the National Transportation Policy, now codified at 49 U.S.C. § 10101. This provision sets out the general policies of the federal government regarding regulation of interstate transportation. The Commission asserts that the mileage-based reimbursement plan falls within its authority "to promote safe, adequate, economical, and efficient transportation," 49 U.S.C. § 10101(a)(2), and "to encourage fair wages and working conditions in the transportation industry," 49 U.S.C. § 10101(a)(6). Section 4 of the Motor Carrier Act of 1980 also makes mention of labor compensation. It amends the National Transportation Policy by adding 49 U.S.C. § 10101(a)(7), which states that it is the policy of the federal government "with respect to transportation of property by motor carrier, to promote competitive and efficient transportation services in order to ... (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions...."

We cannot agree with the Government's contention that section 10101 is a source of ICC rulemaking authority. Based on the wording of the statute, its legislative history, and prior judicial constructions, we conclude that the National Transportation Policy operates to constrain rather than grant rulemaking authority.

The statute does not purport to grant any powers to the Commission, and indeed makes no mention of the agency. Instead, the last sentence reads, "This subtitle shall be administered and enforced to carry out the policy of this section," suggesting that the Commission is constrained to act in accordance with the mandates provided in the statute.

The legislative history of the Motor Carrier Act of 1980, which outlines the National Transportation Policy specifically in regards to the motor carrier industry, explains:

The National Transportation Policy sets the tone for the regulatory structure and is the basis for determining the meaning of statutory provisions. In addition, several provisions of the Act require the Commission to specifically consider the revised National Transportation Policy in carrying out its responsibilities under those sections. [*See, e.g.,* 49 U.S.C. § 10922(b)(2)(A) (Commission must make findings on National Transportation Policy when issuing certificates of public convenience and necessity)].

Section 4 is intended to provide the Commission, the industry, and the public with specific guidelines regarding the Commission's administrative actions. It is clearly the Committee's intent that the Commission must recognize the importance of competition and efficiency in motor carrier operations as the most desirable means for achieving national transportation goals and objectives.

H.R.Rep. No. 1069, 96th Cong., 2d Sess. 11–12, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2293–94. Again, this language indicates that the Commission must act in accordance with the National Transportation Policy, but does not indicate that it is a source of rulemaking power.

The *ATA* case implicitly adopts this view. It rejects an argument that the Commission's rules were invalid because they violated the National Transportation Policy, but never intimates that the Policy, then codified at 49 U.S.C. § 1 prec. note, was a source of Commission authority. 344 U.S. at 313–14, 73 S.Ct. at 316, 97 L.Ed. at 357. *See also Schaffer Transportation Co. v. United States,* 355 U.S. 83, 87–88, 78 S.Ct. 173, 176, 2 L.Ed.2d 117, 121 (1957) ("The National Transportation Policy, formulated by Congress, specifies in its terms that it is to govern the Commission in the administration and enforcement of all provisions of the Act, and this Court has made it clear that this policy is the yardstick by which the correctness of the Commission's actions will be measured."); *Packer Transportation Co. v. United States,* 596 F.2d 891, 893 (9th Cir.1979) ("The guidelines to be used in determining whether the Commission has acted in accordance with the discretion delegated to it is the National Transportation Policy."). Other cases, cited by the Government, have looked to the National Transportation Policy in determining the validity of agency action, but do not in our view stand for the proposition that it is an independent source of ICC rulemaking power.[18]

There are further reasons for not reading the National Transportation Policy as an unfettered source of general rulemaking authority. Such a reading would make superfluous much of the rest of the Revised Interstate Commerce Act, with its detailed guidelines and delegations of authority, since the Commission could always claim that it was acting "to promote safe, adequate, economical, and efficient transportation" under section 10101(a)(2). Such a reading would also make meaningless section 3 of the Motor Carrier Act of 1980, 49 U.S.C. § 10101 note, 94 Stat. 793 (1980), admonishing the Commission to stay within the "well-defined parameters . . . vested in it by the Interstate Commerce Act and other legislation enacted by Congress . . . ." Finally, construing the National Transportation Policy, which paraphrased says little more than "go forth and do good," as a congressional grant of rulemaking authority might well amount to an unconstitutional delegation of legislative authority.[19]

### III.  CONCLUSION

■ Our investigation of ICC rulemaking authority leads us to these conclusions: there can be no doubt that Congress has granted some truly sweeping powers to the ICC, powers that have transformed the transportation industry and removed from it the normal pricing and entry forces that run most of our economy; but Congress has not written a blank check to the agency, for it has admonished the Commission to stay within its specifically vested powers. In promulgating Ex Parte No. 311 (Sub-No. 4), the Commission asserted the power to regulate labor compensation in the interstate motor carrier industry, a power that profoundly affects all segments of the industry, and bears little kinship to the specifically delegated powers granted by the currently effective Revised Interstate Commerce Act of 1978 and Motor Carrier Act of 1980. We therefore hold that the Commission has exceeded its statutory authority.

Professor Davis is undoubtedly correct when he states: "The law allowing delegation of rulemaking power to administrative agencies is clear law, sound law, and necessary law. It is sure to continue, for the kind of government we have developed could not operate without it." 1 K. Davis,

---

18.  The four cases cited by the Government all look to statutory prohibitions or sources of rulemaking authority in addition to the National Transportation Policy in ruling on questions of Commission authority. *American Trucking Ass'ns v. Atchison, T. & S.F. Ry.,* 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967), relied on 49 U.S.C. §§ 1(4), 2, 3(1) (all repealed 1978). *United States v. Pa. R.R.,* 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499 (1945), relied on 49 U.S.C. §§ 1(4), 3(4), 15(3) (all repealed 1978). *Atchison, T. & S.F. Ry. v. ICC,* 607 F.2d 1199 (7th Cir.1979), looked to 49 U.S.C. §§ 1(3)(a), 1(4),

12(1) (all repealed 1978). *Eastern Cent. Motor Carriers Ass'n v. ICC,* 571 F.2d 784 (4th Cir.), *cert. denied,* 439 U.S. 892, 99 S.Ct. 248, 58 L.Ed.2d 237 (1978), looked to 49 U.S.C. § 304(a)(1) (repealed 1978).

19.  At least in theory, Congress cannot constitutionally delegate legislative authority without meaningful standards. *See* 1 K. Davis, Administrative Law Treatise §§ 3:1–1, 3:2 (1978 & Supp.1982). "Verbiage to that effect can be found in at least a hundred Supreme Court opinions." *Id.,* § 3:2 at 151.

Administrative Law Treatise § 3:1 at 150 (1978). Federal agencies are nonetheless creatures of legislative empowerment, limited in authority by legislative enactment.

The orders promulgating Ex Parte No. 311 (Sub-No. 4) are vacated as of 60 days following the date of issuance of our mandate or until such earlier time as the Commission may choose to act. We express no opinion as to the validity of any other regulation, and note that different circumstances may have required a different result.[20]

The judgment intends no retroactive effect. The regulation allowed carriers to fold into their rates charged to shippers the surcharge that existed under the previous surcharge program, and this judgment does not require the fold-ins that took place during a transition period that has now expired to be undone. While the previous surcharge program is not before us, the Commission probably has the power to allow a surcharge for increased fuel costs, as well as the power to allow the surcharge to be folded into the rate structure, under its authority to regulate rates. However, should the surcharge program be reinstituted with a requirement that the amount of the surcharge be passed on by carriers to owner-operators, problems regarding ICC authority to regulate compensation similar to those discussed in this opinion would again surface.

In addition to allowing surcharges to be folded into the rate structure, the regulation allows for future rate increases to reflect increased fuel-related carrier costs. As a result, current rates may now be affected significantly by the regulation. In particular, rates charged for less-than-truckload ("LTL") shipments may be affected, since the regulation makes no distinction between truckload ("TL") and LTL shipments, as did the previous surcharge program, in the method it devises for allowing carrier recovery of increased fuel costs.

We can only guess how rates have been affected, and certainly cannot sit as a rate-making body. We leave ratemaking and adjustments to the Commission, and to any disgruntled shippers who may wish to protest existing rates at the agency level.

We remand to the Commission for its consideration of presently effective rates, and any question raised by the effect of our holding here. Our judgment does not affect these present rates; it only denies to the Commission the authority to fix the compensation of owner-operators as it has done by regulation Ex Parte No. 311 (Sub-No. 4).

VACATED ACCORDINGLY and REMANDED.

ON PETITION FOR REHEARING

No motion for rehearing has been filed by the Interstate Commerce Commission. The Drug and Toilet Preparation Traffic Conference and National Small Shipments Traffic Conference have petitioned for rehearing, contending that we have relegated shippers of less than truck loads to a case by case attack upon the folded-in fuel cost segment of their rates. These shippers have contended throughout that the Commission lacked any rational basis for folding-in fuel costs on the basis of a percentage of revenue, which method forces the shippers paying the highest rates to bear the greater burden of those fuel costs. This is a strong contention and we have the impression that it has not been carefully considered by the Commission. This is one reason why we remanded this entire matter to the Commission for its consideration of presently effective rates along with any matter remaining or raised by our holding on the question of the compensation of owner-operators.

IT IS ORDERED that the petition for rehearing is hereby DENIED.

---

**20.** In particular, we express no view as to the Commission's powers to respond to an emergency situation. Where the whole purpose and scheme of regulation is threatened by an industry crisis, an agency may have extraordinary powers to adopt temporary measures. Arguably one reason for congressional delegation is that agencies can respond more quickly to a sudden problem than the legislature. Unquestionably agencies have some powers in times of emergency that they would otherwise lack. See, e.g., 2 K. Davis, Administrative Law Treatise § 13:10 (1979) (normal hearing and trial requirements do not always apply in emergencies); Bowles v. Willingham, 321 U.S. 503, 519–20, 64 S.Ct. 641, 649–50, 88 L.Ed. 892, 905–06 (1944) (suggesting that constitutional limits of powers of Office of Price Administration must be considered in light of wartime exigencies). Temporary and wartime emergency powers have been granted to the ICC under 49 U.S.C. §§ 10724, 10928(c)(1), 11123, 11127, 11128.